O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DARREN EUGENE SHERMAN-BEY,               )        CASE NO. CV 09-06494 RGK (RZ)
                                         )
                    Plaintiff,           )
                                         )        MEMORANDUM AND ORDER
          vs.                            )        GRANTING DEFENDANTS'
                                         )        DISMISSAL MOTION WITH LEAVE
JOHN MARSHALL, WARDEN, ET AL.,           )        TO AMEND
                                         )
                    Defendants.          )
                                         )

         For the following reasons, the Court GRANTS Defendants' motion to dismiss the complaint but will grant leave to amend.

         Plaintiff, Darren Eugene Sherman-Bey, is a state inmate.  He claims that the defendant prison officials, citing rules, prevented him from engaging in the following three activities that he considers important to his religious observances:  wearing a maroon fez, being supplied with services customized to his religious beliefs, and purchasing certain specially-scented oils not among the five oils permitted by the prison.

/ / /

/ / /

/ / /

/ / /

/ / /

# I.

## BACKGROUND

### A.   Parties

The *pro se* and *in forma pauperis* plaintiff in this civil rights action under 42 U.S.C. § 1983 is housed at California Men's Colony (CMC).  The several defendants were all state prison employees at the time of the underlying events.  With one exception, Plaintiff sues them as individuals and as officials.  They include M. Cates, head of the entire state prison system, whom Plaintiff sues only in his official capacity; John Marshall, CMC's warden; E. Valenzuela (sued as Valenzula), a CMC associate warden; D. Connor, another associate warden; Ahmad Aladarbeh, a Muslim chaplain; H.W. Alderson, a Protestant chaplain; L. Moskowitz, a Jewish chaplain; Marty Cantu, a Native American spiritual leader; John Farao, a Catholic chaplain; and Abdul-Wahab Omeira, another Muslim chaplain.

Plaintiff initially wrote the names of several additional persons as defendants but pointedly struck out their names in the complaint.  He helpfully explained that he was "blacking out the named defendants who cannot be held liable under section 1983 because they were only involved in the administrative grievance process."  Comp. at 3.  Due to an oversight, one of those non-defendants, T. Gonzalez, was listed on the Summons and was served with process.  Because Plaintiff clearly indicated, in the complaint itself, his affirmative intent *not* to sue Gonzalez, the Court should dismiss Gonzalez from the action as a non-party who was served in error.  (In his opposition, Plaintiff seeks to reverse himself again as to Gonzalez, explaining that he misunderstood what "personal involvement" meant.  Opp. at 18.  But it is the complaint that controls, not an opposition brief.  Gonzalez simply is not a named defendant.  Plaintiff may not use his opposition to a dismissal motion to amend his pleading.)

/ / /

/ / /

/ / /

### B.    General Allegations

The following summary assumes the truth of the allegations in the complaint to the extent those allegations are well pleaded.

### 1.    Red fez

Plaintiff is a member of a religious group called the Moorish Science Temple of America (MST), and members wear red or maroon fezzes.  Defendants rejected Plaintiff's request to purchase such a fez, citing prison regulations barring clothing in shades of red or blue, and would only permit him a white or gray fez.  Plaintiff believes that the enforcement of this rule, as to him, is discriminatory.  He notes that other inmates engaged in "sports activities do in fact wear and possess red and other colored clothing allegedly strictly prohibited (i.e., Red, Blue, Black, and Green jersey[s] and baseball caps)."  *See* Comp. at 9-10, 12, 27.  He cites no other examples of inmates being allowed to wear red clothing.

Plaintiff also was only permitted to wear a fez inside his cell and during religious services, although the prison did not similarly restrict prisoners with Muslim or Jewish headwear.  Comp. at 10.

### 2.    Religious services

Defendants did not offer a prison religious service exactly matching MST's tenets.  They offered various other services, including several Christian variants and Jewish and Muslim observances.  The one closest to MST doctrine was a "non-sectarian" Islamic service.  Although MST shares some fundamental beliefs with Islam, the two faiths have important differences.  Plaintiff complained administratively.  He also sent a proposal to the prison's Religious Review Committee to establish an MST group at CMC, including a list of MST members there.  The administrative response was that Plaintiff's religious rights were being accommodated adequately through the availability of the Islamic services at CMC.  *See* Comp. at 11-13.

**3.     Scented oils**

Finally, Defendants denied Plaintiff's request to order certain scented oils, intended for his use in religious observances, on the grounds that the desired oils were not among the five kinds allowed by CMC.  Plaintiff admits that the oils he wanted are not required as a tenet of MST but says they are required by his *individual* beliefs.  Comp. at 14-16.

**C.     Claims**

Plaintiff asserts three legal claims for each of the above three alleged denials of religious matters, for a total of nine counts.  Each such denial, he argues, violated his religious rights under the First Amendment, the Religious Land Use and Institutionalized Persons Act (RLUIPA),42 U.S.C.§ 2000cc-1 *et seq*., and the Fourteenth Amendment.

**D.     Dismissal Arguments**

Defendants assert the following arguments for dismissal:

1.     Plaintiff's allegations are insufficient to state a valid claim under any of his asserted theories.

2.     Plaintiff failed to exhaust his administrative remedies as to the portion of his fez claim asserting that he improperly was restricted to wearing his fez in his cell and during religious observances.

3.     Plaintiff improperly seeks vicarious liability against Defendants Cate, the head of the state prison system, and Marshall, the prison's warden.

4.     Plaintiff cannot recover damages – as opposed to other forms of relief – on his RLUIPA claims or against any defendant in his or her official capacity.

5.     Defendants in their individual capacity enjoy qualified immunity from damages. This Memorandum will discuss these arguments in a slightly different order for efficiency's sake, commencing with numbers 2, 3 and 4, before turning to the issues of qualified immunity and adequacy of the complaint's allegations.

## II.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

The final part of Plaintiff's first (fez-related) claim is that Defendants wrongfully restricted his fez-wearing to inside his cell and during religious services. Defendants argue that Plaintiff failed to exhaust prison administrative remedies as to that subclaim. Defendants are correct.

### A.    Applicable Law

Under the Prison Litigation Reform Act (PLRA), a prisoner generally may not proceed with a civil rights action until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner . . . until such administrative remedies as are available have been exhausted."). This rule governs all claims relating to "prison conditions," a term that includes not only general, ongoing conditions but also individual acts of alleged misconduct or neglect. *See Porter v. Nussle*, 534 U.S. 516, 524, 526-32, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). Moreover, the rule applies even when a plaintiff seeks relief that is unavailable through the prison's grievance system, such as monetary damages. *Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001).

The proper pretrial motion for establishing nonexhaustion is "an unenumerated Rule 12(b) motion rather than a motion for summary judgment. . . . In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the court may look beyond the pleadings and decide disputed issues of fact. . . . If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal without prejudice." *Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir. 2003) (internal citation omitted). California Department of Corrections regulations provide a four-step administrative process for prisoner grievances: (1) an informal Complaint, (2) a first formal appeal with an appeals coordinator, (3) a second level review by the institution

head, regional parole administrator, or their designee, and (4) a third, or "Director's," level review by a designated representative of the director under supervision of the chief of inmate appeals.  *See* CAL. CODE. REGS. tit. 15, §§ 3084.1(a), 3084.5; *Alexandroai v. California Dep't of Corr.,* 985 F. Supp. 968, 969-70 (S.D. Cal. 1997) (*cited with approval in Wyatt*, *supra*, 315 F.3d at 1116 n.8).

Non-exhaustion is an affirmative defense, and therefore it is Defendants' burden to demonstrate Plaintiff's shortcomings in that regard.  *Wyatt,* 315 F.3d at 1119.

**B.    Discussion**

The record obviously favors Defendants.  Both sides rely on the content of the documents that Plaintiff submitted in prosecuting his administrative grievance about the red fez.  *See* Comp. at 20-27.  Those documents focus exclusively on Plaintiff's frustrated desire *to obtain* a red fez.  *See id.*  Although Plaintiff mentions therein the tradition of wearing such a fez, nowhere does he complain about, or seek relief from, the prison's limiting of fez-wearing to Plaintiff's cell and to religious services.  Even if some claims could be exhausted by implication, this is not such a claim – for there was no reasonable implication of such a claim.  What Plaintiff filed did not reasonably place the prison on notice that Plaintiff was challenging anything beyond its restriction on Plaintiff's possessing a red fez.  He has not given the prison a pre-lawsuit chance to investigate his assertions and possibly resolve the subclaim less formally.

Thus, the targeted, latter portion of the fez claim is unexhausted.  The Court expresses no view as to the merits of that part of the claim or the possibility, albeit perhaps remote, that Plaintiff could exhaust it tardily through whatever means his institution may provide for consideration of out-of-time claims.  (Administrative rejection of tardy prisoner claims acts as a procedural default against their consideration in federal court.  *See Woodford v. Ngo*, 548 U.S. 81, 100-02, 126 S. Ct. 2378, 165 L. Ed. 2d 386 (2006).)  What is clear is that the targeted portion of the fez claim currently cannot be entertained in federal court.

# III.

## VICARIOUS LIABILITY

Defendants next argue that Plaintiff improperly seeks vicarious liability against M. Cate, head of the state prison system, and John Marshall, CMC's warden. Prisoner-plaintiffs who allege civil rights violations by "hands-on" prison employees often add their prisons' wardens or other superiors as defendants, reasoning that the latter were in charge and therefore are responsible. But such supervisory officials are not liable vicariously for a constitutional deprivation committed by their subordinates unless (1) the supervisor personally participated in the deprivation or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001).

Here, Plaintiff does not allege facts that satisfy either *Jeffers* exception. He does not allege that Cate or Marshall personally established an improper policy or personally participated in violating a proper one. On the contrary, Plaintiff openly admits that he seeks vicarious liability. He sues Cate, he explains, because Cate is "legally responsible for the overall operation of the Department and each institution under its jurisdiction including CMC." Plaintiff similarly ascribes Marshall's liability to Marshall's being "legally responsible for the operation of CMC and for the welfare of all the inmates of that prison." Comp. at 3. (Plaintiff's opposition brief purports to add new allegations about Cate's and Marshall's responsibility, specifically, for *implementing* the CMC policies that Plaintiff is protesting. *See* Opp. at 19. But he may not thus "improve" his complaint in argumentative briefs rather than by amending the complaint itself.) The Court should grant the vicarious-liability-related portion of Defendants' motion. Unless Plaintiff can satisfy *Jeffers*, he must omit Cate and Marshall from any amended complaint.

/ / /

/ / /

/ / /

/ / /

# IV.

## DAMAGES UNAVAILABLE UNDER RLUIPA
## AND FROM OFFICIAL-CAPACITY STATE DEFENDANTS

Defendants next argue Plaintiff cannot recover damages – as opposed to other forms of relief – on his RLUIPA claims or against any of the state-employee defendants in his or her official capacity.  Defendants are correct.

### A.    RLUIPA Provides No Damages Remedy

Plaintiff does pray for damages, along with other forms of relief, but does not specify in the complaint which forms of relief he seeks based on which laws.  He states in his opposition that he is not seeking any damages based on RLUIPA.  Again, however, Plaintiff may not amend pleadings in argumentative briefs.  Even if he did seek RLUIPA damages, moreover, the Court should grant this portion of Defendants' motion.

RLUIPA unambiguously creates a private right of action for declaratory and injunctive relief, but no court has held that it allows courts to award damages.  On the contrary, although neither the Ninth Circuit[1] nor the Supreme Court yet has decided the

---

[1]As the Fifth Circuit recently explained,

[t]he Ninth Circuit appears to have assumed that a cause of action for monetary relief exists against state actors in their individual capacities, but its cases contain no analysis and are unpublished.  *See Campbell v. Alameida*, 295 Fed.Appx. 130, 131 (9th Cir. 2008) (mem.) (unpublished); *Von Staich v. Hamlet*, Nos. 04-16011 & 06-17026, 2007 WL 3001726, at *2 (9th Cir. Oct. 16, 2007) (mem.) (unpublished).

*Sossaman v. Lone Star State of Texas*, 560 F.3d 316, 327 n. 23 (5th Cir. 2009). Even stating that the Ninth Circuit "assumed" the availability of a RLUIPA damages remedy may be going too far. In neither *Campbell* nor *Von Staich* did the state even *argue* that no such remedy existed. Instead, in both cases, the state asserted qualified immunity from RLUIPA claims (for which claims the plaintiffs happened to seek damages relief, among other remedies).  It is the parties, not the Ninth Circuit, that appear tacitly to have assumed the availability of damages.  The appellate court simply addressed the legal issues as the parties framed them in those two cases, never addressing the unframed issue of *whether* RLUIPA allowed a damages remedy.  That the

1  issue, all courts that have decided it have rejected such a remedy, not only against
2  individual-capacity defendants but also against official-capacity defendants. "[A]n action
3  under RLUIPA does not exist for individual capacity claims." *Sossaman v. Lone Star State*
4  *of Texas*, 560 F.3d 316, 329 (5th Cir. 2009).   This is because RLUIPA, grounded
5  principally on the Spending Clause of the Constitution, operates essentially as a contract
6  between the states on the one hand, which receive federal money, and the federal
7  government on the other.   Individual state employees do not receive such money and thus
8  are not subject to suit for money. *Id.* at 327-29; *Smith v. Allen*, 502 F.3d 1255, 1273 (11th
9  Cir. 2007).  RLUIPA also does not permit recovery against state employees in their *official*
10 capacity – in legal effect, against the state itself, *see Hafer v. Melo*, 502 U.S. 21, 25, 112
11 S. Ct. 358, 116 L. Ed. 2d 301 (1991) – because RLUIPA did not abrogate states' sovereign
12 immunity.  *See Sossaman*, 560 F.3d at 329-30.

13

14      **B.     State Employees Enjoy Sovereign Immunity In Their Official Capacity**
15              The Supreme Court has held that the Eleventh Amendment bars suits brought
16 against a state by that state's own citizens. *Pennhurst State School & Hosp. v. Halderman*,
17 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984).  As noted above, suits against
18 state officials in their *official* capacity are tantamount to actions against the state itself, *see*
19 *Hafer, supra*, and federal courts thus lack jurisdiction to entertain such suits for damages.
20 *Id*.  Here, Plaintiff sues all of the state-employee defendants in both their individual and
21 official capacities.  He seeks damages.  The Court will grant this portion of the dismissal
22 motion.
23 / / /
24 / / /
25 / / /
26
27 _____
28 Ninth Circuit did not, *sua sponte*, launch a skeptical inquiry into the availability of damages as a RLUIPA remedy is of negligible precedential value.

## V.

## QUALIFIED IMMUNITY

Government officials are entitled to immunity in their individual capacity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  The immunity thus shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  The first of two analytical steps for the Court is to ask, "do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  If no constitutional violation is shown, the immunity applies, and the Court's inquiry ends.  *See id*.  If, however, the well-pleaded facts in the complaint show the violation of a constitutional right, then the Court must ask the second question, "whether the right is clearly established."  *Id*.  A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

The Supreme Court recently retreated somewhat from the two-part *Saucier* test.  In some cases, the high court explained, it may be clearer that a defendant qualifies for immunity under the *second* prong than under the first.  In such instances, courts may uphold immunity without resolving the first *Saucier* question.  *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

This Memorandum addresses qualified immunity in this case, as necessary, below in conjunction with its analysis of whether the complaint fails to state a claim under Rule 12(b)(6).

/ / /

/ / /

/ / /

/ / /

## VI.

## ADEQUACY OF PLEADING (RULE 12(B)(6))

Defendants' main dismissal argument is that Plaintiff's claims are facially deficient under FED. R. CIV. P. 12(b)(6). A "complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory"; otherwise, it is subject to dismissal for failure to state a claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting, and including original emphasis from, *Car Carriers Inc. v. Ford Motor Co*., 745 F.2d 1101, 1106 (7th Cir. 1984)). An incarcerated *pro se* civil rights plaintiff must be given leave to amend a deficient complaint unless "it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Broughton v. Cutter Lab*., 622 F.2d 458, 460 (9th Cir. 1980) (per curiam).

Recently, in *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (May 18, 2009), the Supreme Court explained that *Twombly* effectively required more definite pleading of evidentiary facts, as opposed to conclusions or boilerplate. *Iqbal* requires a court weighing a Rule 12(b)(6) motion in a civil rights action to determine whether the plaintiff has "plead[ed] factual matter that, if taken as true, states a claim that [defendants] deprived him of his clearly established constitutional rights[.]" 129 S. Ct. 1942-43. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 1949 (citation omitted) (quoting *Twombly*, *supra*, 550 U.S. at 555, 557) (brackets as in *Iqbal*).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# VII.

## DISCUSSION

**A.    Free Exercise Clause**

### 1.    Applicable law

Incarceration does not eliminate inmates' First Amendment rights.  *See Cruz v. Beto*, 405 U.S. 319, 322 n.2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).   But prison authorities may restrict the constitutional freedoms that inmates otherwise would enjoy, so long as the restrictions are rationally related to a legitimate and neutral governmental objective.  *See Turner v. Safley*, 482 U.S. 78, 87, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) (addressing prison restriction on inmates' speech and marriages).   To guide courts in determining whether a challenged prison regulatory policy is "reasonably related to legitimate penological interests," *Turner* established a deferential four-part test whereby courts examine –

(1)    whether the regulation is rationally related to a legitimate and neutral governmental objective;

(2)    whether there are alternative avenues that remain open to the inmates to exercise the right being regulated;

(3)    whether accommodating the asserted right will have a negative impact on other guards and prisoners, and on the allocation of prison resources; and

(4)    whether there were other ready alternatives, i.e.*,* whether the circumstances suggest that the prison's restriction is pretextual.

482 U.S. at 89-90, *followed in Shakur v. Schriro*, 514 F.3d 878, 886 (9th Cir. 2008).  It is the plaintiff's burden to disprove a challenged prison regulation's validity, not the prison's burden to uphold it.  *Overton v. Bazzetta*, 539 U.S. 126, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003).

/ / /

/ / /

/ / /

2.     **Analysis**

a.     **Red fez**

Plaintiff does not even allege that the prison's rule generally barring inmates from wearing red clothing is *not* "reasonably related to legitimate penological interests." Even if the complaint could be construed liberally as so alleging generally, Plaintiff's specific background factual allegations do not reasonably support such an inference. His allegations also appear to fall short of explaining (as opposed to labeling) a *religious* basis for needing to wear a red fez as opposed to the white or gray ones allowed by the prison. Instead, Plaintiff recites that the red color is traditional and notes that some other reported cases have referred to red fezzes as traditional (without deciding that such headgear was a religious requirement). Perhaps Plaintiff rests more of his hopes on (a) his RLUIPA claim and/or (2) his Equal Protection claim, *i.e.*, his assertion that it is unconstitutional for the prison to allow inmates to wear red while engaged in sports but not for religious reasons. In any event, he fails to state a valid claim that the red-clothing ban violates his Free Exercise rights.

All of the Defendants sued in their individual capacity enjoy qualified immunity, for Plaintiff fails even to state a constitutional violation in the first place.

b.     **Religious services**

Plaintiff's First-Amendment-claim allegations (as opposed to his Equal Protection allegations) about religious services are largely a string of conclusions that his rights were violated. He does not allege that the defendants are affirmatively hindering his religious observances. Rather, Plaintiff's essential complaint is that Defendants *aren't assisting* him as much as they are helping inmates observing other religions. Such is an equal protection argument, to which this Memorandum turns later, not a free exercise argument. Plaintiff does not even generally allege that the prison's limitation on the total number of specific faiths for which the prison provides religious services is not "reasonably related to legitimate penological interests." Under Plaintiff's theory of free exercise rights

– again, as opposed to equal protection rights – the prison would be required to provide the same logistical support to a religion claiming nine inmate adherents, or even one, as to a religion with hundreds of inmate adherents.  Such is not and cannot be the law governing prisons. Plaintiff states no claim.  All of the Defendants sued in their individual capacity also enjoy qualified immunity in this respect.

### c.   Scented oils

Plaintiff's prison allows inmates to obtain and use only five kinds of scented oils.[2] Plaintiff alleges that he wants other oils instead, bearing names – upon one of which Defendants have seized here with scorn and glee – such as "Hawaiian Tropics."  He wants that particular oil, he explains, not for its island allure but because it meets his desire for a "sweet-smelling" oil.  The Free Exercise aspect of the scented-oil claim is infirm.  At the very least, Plaintiff fails to allege that – and to include underlying factual allegations establishing why – every single one of the five scented oils permitted by the prison fails to satisfy his idiosyncratic religious needs for a sweet-smelling oil.  (Specifically, he fails to allege that he has smelled all five of the permitted oils or otherwise has a foundation for knowing that none is "sweet-smelling.")  This alone justifies granting the corresponding part of the dismissal motion, including the portion asserting qualified immunity for the individual-capacity defendants.

Perhaps more fundamentally, Plaintiff admits that his desire to use Hawaiian Tropics in prayer rituals springs solely from his *individual* religious views, not from the religious beliefs of MST as a group.   He expressly told his prison's Religious Review Committee, in a letter explaining why he wanted the special oils, that "I am not claiming

---

[2]   The names given to the oil scents permitted by state prison regulations – and the Court is at a loss as to how these terms are policed for consistently supplying the same aroma, and how to *define* that aroma – are African Musk, Blue Nile, firdous, frankincense and sandalwood. Plaintiff indeed ordered one of these scents, namely frankincense, but he also sought to order Hawaiian Tropics and oils called Kush and "Lily of the Valley (mixed with) Lavender 1:1." *See* unpaginated exhibit to Comp.

that a group follows what I follow."  Plaintiff's March 23, 2009 letter (unpaginated ex. to Comp.).  As to use of non-permitted oils, at least, Plaintiff is thus a religion unto himself – in effect a subsect of MST, itself a sect related to Islam.  It is unclear whether Plaintiff's admission, namely that his views on oil use are not his religion's but his alone, negates any valid oil-related claim.  *But see Shakur*, *supra*, 514 F.3d at 884 (noting that requirement of "centrality" to religious beliefs no longer applies to inmates' religious claims but that prisoners still must show that restricted conduct impinges on (1) sincerely held (2) *religious* belief).  The Court makes no ruling based on Plaintiff's unusual admission about oil use.

### B.    RLUIPA

#### 1.    Applicable law

RLUIPA requires that, if an inmate carries an initial burden of showing that the government is imposing a "substantial burden" on the inmate's exercise of religion, then the burden shifts to the government to show that the regulation at issue furthers a compelling state interest in the least restrictive manner.  42 U.S.C. § 2000cc-1(a); *see Mayweathers v. Newland*, 314 F.3d 1062, 1070 (9th Cir. 2002).  RLUIPA itself does not define "substantial burden."  The Ninth Circuit has explained that a burden is "substantial" when the institution "denies [an important benefit] because of conduct that is *mandated* by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and violate his beliefs."  *Shakur*, *supra*, 514 F.3d at 888 (bracketed text in original) (internal quotation omitted) (emphasis added).

#### 2.    Analysis

##### a.    Red fez

As noted above, Plaintiff's "allegations also appear to fall short of explaining (as opposed to labeling) a *religious* basis for needing to wear a red fez as opposed to the white or gray ones allowed by the prison; instead, Plaintiff recites that the red color is

1   traditional and notes that some other cases have referred to red fezzes (without deciding

2   that such headgear was a religious requirement)."  A red fez may be traditionally worn by

3   MST adherents, but Plaintiff does not including factual allegations supporting a finding

4   that it is a sincere *mandate* of his faith.  *Shakur, supra*.  He thus cannot logically show –

5   and does not allege – that the prison's color restriction pressures him to change or violate

6   his faith.

7

8                          **b.     Religious services**

9               Plaintiff does not allege that the prison is imposing any "burden" on him at

10  all with respect to religious services.  He alleges that the prison is not offering the same

11  affirmative *assistance* to MST inmates as it offers to more popular religions – not that the

12  prison is punishing him for his faith or actively preventing his observances in this sense.

13  He does not allege that, *because* MST inmates are not receiving their own, custom-tailored

14  religious services, he is being put "under substantial pressure . . . to modify his behavior"

15  or to "violate his beliefs."

16

17                          **c.     Scented oils**

18              For reasons similar to those noted in the Free Exercise section of this

19  Memorandum, Plaintiff fails to state an oil-based RLUIPA claim.  Perhaps it is possible for

20  an inmate who admits his religious needs are *solely* his – as Plaintiff appears to do with

21  respect to sweet-smelling oils for prayer use – to state a RLUIPA claim based on those

22  needs.  (On the one hand, such a "single adherent" course may be subject to abuse by

23  inmates who may claim insincerely that various and sundry privileges and rules-exceptions

24  are "mandated" by their *individual* religious views.  On the other hand, many religious

25  presumably had their beginnings with only one sincere adherent.)   But Plaintiff has not

26  alleged that he has sniffed the prison-permitted oils or otherwise has foundation to know

27  that those oils are unsatisfactory as a matter of sincere, if unique, *religious* beliefs.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.   Equal Protection Clause

#### 1.   Applicable law

The Fourteenth Amendment's Equal Protection Clause generally requires that state actors treat similarly-situated persons alike. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1983).  In the context of this case, the Clause protects a state prisoner's "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto, supra*, 405 U.S. at 322.  Absolute equality is not required; an opportunity that is "reasonable" and "comparable" may not always be identical. *Id*. at 322 & n.2.  For example, prisons cannot reasonably be required to provide chaplains of every faith but, instead, must make a good faith accommodation of a prisoner's free-exercise rights in light of practical limitations. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997).  Thus, a prison's providing certain services to some inmates with a more common religious belief does not necessarily violate the equal-protection rights of other inmates not afforded similar services. *See, e.g.. Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987).

A prisoner states a religion-based Equal Protection claim by alleging (1) that the treatment he received differed from that received by "similarly situated" inmates, *see Cleburne*, 473 U.S. at 439; and (2) that the difference is not "reasonably related to legitimate penological interests." *See Turner*, *supra*, 482 U.S. at 89.

#### 2.   Analysis

##### a.   Red fez

Plaintiff's sole remaining equal-protection critique of the prison's policy –now that the Court has decided to dismiss, as unexhausted, Plaintiff's subclaim about *where* he is permitted to wear a fez – is that the prison allows inmates engaged in sports to wear otherwise-forbidden red clothing.  Plaintiff fails to allege that inmates "similarly situated" to him – those wishing to wear red clothing for religious reasons, not for inmate

team members in sports settings – *have* been permitted to wear red.  He states no claim, and the individual defendants thus also enjoy qualified immunity.

### b.   Religious services

Glaringly absent from the complaint is any allegation that a "similarly situated" religious group, i.e., one that claims nine or fewer adherents, has received separate religious services of the sort Plaintiff seeks for MST inmates.  He states no claim, and qualified immunity again applies.

### c.   Scented oils

Again, Plaintiff does not allege that any other inmate has enjoyed an exception, similar in nature to the exception he seeks, to the prison's rule restricting inmates to the use of five specific oils.  He states no claim.  The individual defendants enjoy qualified immunity.

### VIII.
### LEAVE TO AMEND

Although the initial complaint plainly is infirm in the ways discussed above, it is possible that an amended version could state a valid claim.  Accordingly, the Court will grant Plaintiff leave to attempt to do so, as discussed below.

### IX.
### CONCLUSION

Based on the foregoing, the Court GRANTS Defendants' dismissal motion. The Complaint hereby is DISMISSED, and leave to amend is granted to correct the foregoing flaws (but not for other purposes, such as to expand the scope of the action to include new defendants or new claims).  More specifically, Plaintiff has three options:

(1)  **Plaintiff may pursue this action further** by filing an original and one copy of a pleading captioned as his First Amended Complaint (1AC), bearing the current case number, within 30 days of the filing date of this Order.  To withstand another dismissal, the 1AC must correct the deficiencies identified in this Order and must comply with the Federal Rules of Civil Procedure and this Court's Local Rules.  The 1AC must be complete in itself and must not refer to any prior version of the complaint.

(2)  **Plaintiff may file a "Notice of Intent Not to Amend Complaint" within 30 days** of the filing date of this Order.  If Plaintiff timely files such a Notice, then the undersigned will recommend to the assigned District Judge that this action be dismissed, freeing Plaintiff to appeal the dismissal on the grounds cited above.  *See Edwards v. Marin Park*, *Inc.*, 356 F.3d 1058, 1063-66 (9th Cir. 2004).

(3)  **Plaintiff may do nothing** in response to this Order.  If Plaintiff does not file a document pursuant to either option 1 or 2 above within the 30-day deadline, then the Court may deem him to have consented to dismissal of this action for failure to prosecute and for failure to comply with this Order.  *See id*.

**The Court cautions Plaintiff that if he fails to file a timely amended complaint or otherwise fails to comply substantially with the terms of this Order, then this action may be dismissed.**

IT IS SO ORDERED.

DATED:    July 22, 2010

_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE